USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/4/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
MIGUELINA CALDERON,                                               :
                                                                  :
                                        Plaintiff,                :    14 Civ. 1082 (PAE)
                                                                  :
                    -v-                                           :    OPINION & ORDER
                                                                  :
THE CITY OF NEW YORK, et al.,                                     :
                                                                  :
                                        Defendants.               :
                                                                  :
------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      In 2013, a three-month investigation revealed that one German Perez was trafficking in cocaine out of 275 East 201st Street, a Bronx apartment building. New York Police Department ("NYPD") Detective James South swore out an affidavit seeking search warrants for apartments 5F and 5K in that building; a state court judge issued a warrant to search those apartments. NYPD officers then conducted searches pursuant to these warrants. In apartment 5F, the officers found and briefly handcuffed plaintiff Miguelina Calderon, but the search of that apartment yielded no evidence of Perez, drug-dealing, or other criminal activity. In apartment 5K, the officers found and arrested Perez and seized drugs.

      Calderon now brings this action under 42 U.S.C. § 1983 and state law, alleging that Detective South made false statements in the affidavit seeking authority to search apartment 5F. In particular, she claims that the NYPD detectives falsely represented that they had seen Perez accessing apartment 5F shortly before and after selling drugs to a confidential informant outside the building, and that a magistrate presented with an accurate affidavit would not have issued the search warrant. She alleges that she was falsely arrested and wrongfully imprisoned as a result

of the execution of the unjustified search of her apartment. She further alleges that the City of New York ("the City") failed to properly train and discipline its officers with respect to seeking search warrants. Calderon seeks compensatory damages of $1 million, plus punitive damages.

Defendants the City and South move to dismiss Calderon's Second Amended Complaint ("SAC") as to all claims. For the reasons that follow, the Court grants the motion to dismiss the SAC, but without prejudice to Calderon's right to replead.

## I. Background[1]

### A. The Parties

Calderon resides in apartment 5F of 275 East 201st Street ("the building") in the Bronx. SAC ¶ 6. She has lived there since July 2012. *Id.* ¶ 17.

Calderon has sued 12 defendants. *Id.* ¶¶ 7–13. The first, the City, is responsible for the NYPD. The second, South, swore out an affidavit in which he stated, *inter alia*, that he had personally seen Perez, a narcotics trafficking suspect, exit apartment 5F shortly before selling cocaine to a confidential informant outside the building, and that a fellow officer had seen Perez enter apartment 5F immediately after such a sale. The other defendants are 10 John or Jane Does—police officers and detectives "whose identities are currently unknown who are members of the NYPD who took place in the incident described herein." *Id.* ¶ 13. South and the 10 Does are sued in their individual and official capacities. *Id.* ¶¶ 9, 13.

---

[1] For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts in the Second Amended Complaint, Dkt. 25 ("SAC"), to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court also considers "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *accord Halebian v. Berv*, 644 F.3d 122, 130 n.7 (2d Cir. 2011).

### B. Calderon's Occupancy of Apartment 5F Before the August 27, 2013 Search

In or about June 2012, Calderon signed a lease with her landlord for apartment 5F. *Id.* ¶ 16. In or about July 2012, she moved into apartment 5F with her husband and her son. *Id.* ¶ 17. No one else lived with them. *Id.* "In July 2012, the Con Edison bill for the apartment was put in [Calderon's] name." *Id.* ¶ 18.

As to access to the apartment, Calderon alleges that in July 2012, she "installed a top lock and only [she], her husband, and her son had the key. The key cannot be duplicated unless you have a special card. The building did not have a copy of the key or the card." *Id.* ¶¶ 19–21. Further, in August 2012, "ADT installed an alarm system that covered, among other places, the entrance to the apartment." *Id.* ¶ 22. This alarm "was always turned on when no one was in the apartment." *Id.* ¶ 23. If the alarm were activated, ADT would notify plaintiff by phone before contacting the authorities. *Id.* ¶ 24.

### C. Detective South's Affidavit in Support of a Search Warrant

On August 22, 2013, South swore out a seven-page affidavit in support of warrants to search apartments 5F and 5K. *See* Dkt. 27 ("Siddiqi Decl."), Ex. B. In it, South stated, among other things, the following[2]:

---

[2] Calderon contests the truthfulness of some statements made in the affidavit, but not the fact that South made them. Indeed, Calderon's SAC, in claiming violations of § 1983 and state law, relies on the fact that these statements, some of which she claims were false, were made to secure the warrant to search apartment 5F. *See, e.g.*, SAC ¶ 30 ("[T]he information that SOUTH provided to the Court about Perez entering and exiting was false . . . ."). It is, therefore, proper to consider, on defendants' motion to dismiss, the statements made in the affidavit, for the fact that they were made to secure the warrant. *See generally Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) ("'[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.' Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d

1. In approximately May 2013, NYPD's Narcotics Borough Manhattan North unit began investigating narcotics activity at 275 East 201st Street. *Id.* ¶ 4.

2. On two occasions in August 2013, South conducted "controlled" purchases using a confidential informant ("CI"), *id.* ¶¶ 8, 9, who had a history of reliability, *id.* ¶ 5. In each case, the CI purchased cocaine from a man inside a Ford Explorer situated outside of 275 East 201st Street. *Id.* ¶¶ 8, 9. Before each purchase, the drug dealer emerged from within 275 East 201st Street. *Id.* After each purchase, the CI exited the Ford Explorer and met South, where the CI handed South a plastic twist bag containing a white powdered substance. *Id.* Field tests were positive for cocaine each time. *Id.* ¶¶ 8a, 9a.

3. After a car stop, South identified the drug seller as German Perez. *Id.* ¶ 7. Perez showed South a New York State driver's license bearing the name "German Perez" and the address of "275 E 201st St #5F, Bronx, New York." *Id.*; *see also id.*, Ex. C.

4. As to the first purchase, after giving the CI money to buy drugs, South went to a stairwell within 275 East 201st Street, "overlooking the fifth floor." *Id.*, Ex. B at ¶ 8. From that position, South "observed Perez exit Apartment 5F, retrieve keys from his pocket, and use the keys to enter Apartment 5K." *Id.* South "then observed Perez exit Apartment 5K and enter an elevator. A few minutes later, [South] observed Perez exit an elevator on the fifth floor of 275 East 201st Street, retrieve keys from his pocket, and use the keys to enter Apartment 5K." *Id.* When South returned to his

---

Cir. 1995) (per curiam)); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). On this basis, the Court has considered the affidavits to search apartments 5F and 5K, and the resulting warrants that issued to search those apartments. *See* Siddiqi Decl., Exs. B–E.

vehicle, the CI handed him a plastic bag containing cocaine.  *Id.*  The CI reported to South that he had seen Perez exit 275 East 201st Street before entering the Ford Explorer, where Perez sold the cocaine to the CI.  *Id.*

5. As to the second purchase, after giving the CI money to buy drugs, South, while near 275 East 201st Street, "observed Perez driving a grey Ford Explorer," park the Ford Explorer in front of 275 East 201st Street, and then enter that building.  *Id.* ¶ 9.  South was "informed by Detective Alexander Sosa . . . who was located on the fifth floor of 275 East 201st Street, that he observed Perez exit an elevator on the fifth floor of [the building], remove keys from his pocket, and use the keys to enter Apartment 5K. Detective Sosa then observed Perez exit Apartment 5K and enter the elevator."  *Id.* South "then observed Perez exit 275 East 201st Street and enter the Ford Explorer. [South] observed CI enter the Ford Explorer and exit a short time later.  [South] then observed Perez park the Ford Explorer a short distance away, exit the Ford Explorer, and enter 275 East 201st Street."  *Id.*  Sosa informed South "that, a few moments later, he observed Perez exit the elevator on the fifth floor of 275 East 201st Street, retrieve keys from his pocket, and use the keys to enter Apartment 5F."  *Id.*  Around that time, the CI again handed South a plastic bag containing cocaine.  *Id.*

6. Apartments 5F and 5K are located on the same floor, but are on different sides of the hallway.  Each door has a clearly marked apartment number.  *Id.* ¶ 11.

On August 22, 2013, on the basis of South's affidavit, the Honorable Steven M. Statsinger of the Criminal Court of the City of New York issued no-knock search warrants for apartments 5F and 5K.  *Id.*, Ex. D.  The warrants authorized the officers to search for (among other things) cocaine, proceeds from drug trafficking, and the person of German Perez.  *Id.*

5

On August 26, 2013, South presented a modified affidavit to correct a typographical error pertaining to the borough of the premises (the original affidavit mistakenly said "New York, New York," not "Bronx, New York"). *Id.*, Ex. D at ¶ 3. On the same date, Judge Statsinger issued a search warrant based on the corrected affidavit. *Id.*, Exs. D, E.

### D.     The August 27, 2013 Search and Aftermath

On August 27, 2013, South and other unidentified NYPD officers went to Calderon's apartment, 5F, to execute the search warrant. She was inside the apartment when, between 3 and 4 p.m., she heard banging at the door as she was leaving the shower. SAC ¶ 33. She "grabbed a towel and looked through the peephole" of the door, where she saw "people in dark clothing breaking down her door." *Id.* She "opened her door and the police entered waiving [sic] a piece of paper." *Id.* ¶ 34. She was handcuffed while wearing only a towel; she did not consent to being handcuffed. *Id.* ¶¶ 35–36. The handcuffs were momentarily removed to permit Calderon to clothe herself. *Id.* ¶ 37. Police then showed Calderon a photocopy of German Perez's driver's license (which showed his address as apartment 5F in that building); Calderon replied that he did not live in the apartment. *Id.* ¶ 38. An officer told Calderon that Perez still paid her Con Ed bill; Calderon responded that this was impossible, because she had been living in the apartment for 13 months and the bill was in her name. *Id.* ¶ 40. Calderon also "informed the police that the building's Superintendent had previously told her that a lady who used to live in the apartment [*i.e.*, apartment 5F] now lived in apartment 5K." *Id.* ¶ 42. The police then went to apartment 5K "and arrested the male and seized drugs." *Id.* ¶ 43. No evidence of contraband was found in apartment 5F. *Id.* ¶ 45. Calderon "was eventually released from custody." *Id.* ¶ 46. When entering Calderon's apartment, the police officers damaged her door, which took three days to repair. *Id.* ¶ 54.

### E.     Procedural History

On February 20, 2014, Calderon filed a Complaint.  Dkt. 2.  On May 9, 2014, the City answered.  Dkt. 4.  On November 5, 2014, after settlement discussions pursuant to the District's § 1983 Plan, and after an initial pretrial conference, Dkt. 18, Calderon filed a First Amended Complaint ("FAC").  Dkt. 19.  On December 15, 2014, Calderon sought leave to file a Second Amended Complaint ("SAC"), Dkt. 21, which the Court granted, Dkt. 23.  On December 19, 2014, Calderon filed the SAC.  Dkt. 25.

The SAC brings four causes of action: (1) a § 1983 claim against South and the Doe officers for wrongful arrest and false imprisonment during the execution of the search warrant; (2) a *Monell* claim against the City, based on its alleged failure to train, supervise, and discipline employees with respect to obtaining search warrants; (3) a state-law claim, mirroring the § 1983 claim, for false arrest and imprisonment; and (4) a claim for attorneys' fees under 42 U.S.C. § 1988.  *See* SAC pp. 9–16.

On January 9, 2015, defendants moved to dismiss, Dkt. 26, and filed a supporting memorandum of law, Dkt. 29 ("Def. Br."), and an accompanying declaration, Dkt. 27.  On January 26, 2015, Calderon filed an opposition brief.  Dkt. 30 ("Pl. Br.").  On February 6, 2015, the defendants filed a reply brief.  Dkt. 31 ("Def. Reply Br.").  On February 20, 2015, the Court held argument.  *See* Dkt. 23.

## II.     Applicable Legal Standards Governing Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. "[R]ather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citing *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*).

## III.   Discussion

Calderon's claims of wrongful arrest and false imprisonment turn on whether the search of her apartment was lawful. If the search was lawful, all of Calderon's claims necessarily fail, because it is well established that officers may briefly detain occupants of an apartment during a lawful search, *see Michigan v. Summers*, 452 U.S. 692, 705 (1981), and Calderon does not allege here that a valid search was improperly executed (*e.g.*, that she was detained for too long during the search). Instead, she asserts that the search was unlawful because South knowingly or recklessly made false statements in his application for a search warrant, and based on those false statements, the state court judge found probable cause and issued the search warrant. *See, e.g.*, SAC ¶¶ 1, 48, 55, 57, 60. If Calderon has adequately so pled, then (subject to challenges specific

to particular claims or defendants) her claims may proceed to discovery. The Court therefore considers at the outset whether the SAC adequately pleads that the warrant was improperly procured so as to make the resulting search unlawful.

The requirement of a search warrant derives from the Fourth Amendment. It provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

The Supreme Court has recognized exceptions to the Fourth Amendment's warrant requirement, including where a person voluntarily consents to the search of his person or premises. *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *accord Fernandez v. California*, 134 S. Ct. 1126, 1133 (2014).[3] But the Court has expressed a clear preference for searches conducted pursuant to warrants issued by neutral magistrates, based on a finding of probable cause. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("It is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'") (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)); *Payton v. New York*, 445 U.S. 573, 586 (1980) (same); *Illinois v. Gates*, 462 U.S. 213, 236 (1983).

---

[3] Other recognized exceptions include to prevent the imminent destruction of evidence, *see Kentucky v. King*, 131 S. Ct. 1849, 1858 (2011); to enable officers to render emergency assistance, *see Michigan v. Fisher*, 558 U.S. 45, 47 (2009); to seize evidence in plain view, *see Horton v. California*, 496 U.S. 128, 136–40 (1990); to fight a fire and investigate its cause, *see Michigan v. Tyler*, 436 U.S. 499, 509 (1978); and to engage in "hot pursuit" of a fleeing suspect, *see United States v. Santana*, 427 U.S. 38, 42–43 (1976).

Where a search has been conducted pursuant to a court-authorized warrant, "great deference" is due to a magistrate's determination that there is probable cause to search a premises. *United States v. Leon*, 468 U.S. 897, 914 (1984) (citations omitted). "Normally, the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (citing *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

Deference to the magistrate's finding of probable cause, however, "is not boundless," *Leon*, 468 U.S. at 914, and while a party challenging a warrant on the ground that it was issued on less than probable cause bears a "heavy burden," *Golino*, 950 F.2d at 870, that burden can be met. In particular, it is appropriate to inquire whether the affidavit on which the probable cause determination was based was knowingly or recklessly false. Under *Franks v. Delaware*, 438 U.S. 154 (1978), a criminal defendant who seeks to suppress the fruits of a search warrant must show that (1) the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false statements or omissions in his application for a warrant, and (2) such statements or omissions were necessary to the finding of probable cause. *Id.* at 155–56; *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005); *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000).

This same standard applies in civil cases, like this one, brought pursuant to § 1983, in which a plaintiff seeks to challenge a warranted search as unlawful. *See, e.g.*, *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994) (citing *Franks*, 438 U.S. at 171–72; *Golino*, 950 F.2d at 870–71); *Magnotti v. Kuntz*, 918 F.2d 364, 368 (2d Cir. 1990) (applying *Franks* standard to issues of qualified immunity in § 1983 action). In such cases, a plaintiff must make a "substantial

preliminary showing" that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a material false statement in applying for the warrant. *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991) (quoting *Franks*, 438 U.S. at 155–56). "Unsupported conclusory allegations of falsehood or material omission" cannot support a challenge to the validity of the warrant; rather, the plaintiff must make "specific allegations" supported by an offer of proof. *Velardi*, 40 F.3d at 573. The *Franks* standard is, thus, "a high one." *Rivera*, 928 F.2d at 604.

In such challenges, as to the first *Franks* element, it is insufficient for a plaintiff to allege that there were *errors* in the affidavit, as "misstatements or omissions caused by 'negligence or innocent mistake[s]'" do not establish falsity or reckless disregard. *United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2820 (2014) (quoting *Franks*, 438 U.S. at 171); *accord Rodriguez*, 497 U.S. at 184 ("If a magistrate, based upon seemingly reliable but factually inaccurate information, issues a warrant for the search of a house in which the sought-after felon is not present, has never been present, and was never likely to have been present, the owner of that house suffers one of the inconveniences we all expose ourselves to as the cost of living in a safe society; he does not suffer a violation of the Fourth Amendment."). Instead, it must be alleged that any misrepresentations or omissions were "designed to mislead, or that [they were] made in reckless disregard of whether they would mislead." *Rajaratnam*, 719 F.3d at 154 (quoting *United States v. Awadallah*, 349 F.3d 42, 68 (2d Cir. 2003)) (emphasis omitted). Recklessness may be inferred when information omitted from an affidavit was "clearly critical" to the determination of probable cause. *McColley v. County of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014) (quoting *Rivera*, 928 F.2d at 604).

11

As to the second *Franks* element, a false statement is material when "the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding." *Martin*, 426 F.3d at 73 (quoting *Awadallah*, 349 F.3d at 64–65). Courts assess materiality using the "corrected affidavits" approach. *McColley*, 740 F.3d at 823 (citing *Escalera v. Lunn*, 361 F.3d 737, 743–44 (2d Cir. 2004)). A court looks "to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, based on [all] existing facts known to the applicant," would have sufficed to support probable cause. *Escalera*, 361 F.3d at 743–44 (citing *Franks*, 438 U.S. at 171–72; *Loria v. Gorman*, 306 F.3d 1271, 1289 (2d Cir. 2002); *Smith v. Edwards*, 175 F.3d 99, 105 (2d Cir. 1999)). Issues are not material if, after eliminating any allegedly false information and adding any omitted facts, the corrected affidavit would still have supported a finding of probable cause. *See Velardi*, 40 F.3d at 573 (citing *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993); *Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir. 1992)). In conducting the corrected affidavit inquiry, as in assessing a search warrant application in the first instance, a court is not to be overly strict or technical in assessing whether there is probable cause. A judge must instead "simply . . . make a *practical, common-sense* decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a *fair probability* that contraband or evidence of a crime will be found in a particular place." *Martin*, 426 F.3d at 74 (quoting *Gates*, 462 U.S. at 238) (internal quotation marks omitted) (emphasis in *Martin*).[4]

---

[4] Defendants raise a qualified immunity defense, under which, "[a]s government officials performing discretionary functions, the defendants enjoy a qualified immunity that shields them from personal liability for damages under section 1983 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

Applying these principles here, the Court notes that South's application with respect to apartment 5F, considered on its face, clearly articulated probable cause to believe that evidence or proceeds of narcotics trafficking would be found in that apartment. The affidavit alleged that the CI had reported purchasing controlled substances in the vicinity of the building and had twice in the preceding two weeks bought cocaine from Perez immediately outside the building. As to the first cocaine sale, South attested that he had seen Perez exit apartment 5F, then enter apartment 5K, and then proceed outside the building to sell cocaine to the CI. As to the second sale, South, reporting what he had been told by Sosa, attested that Sosa, following the sale, had observed Perez, using keys, enter apartment 5F. Significantly, Perez, when his car was pulled over for a stop, had produced a driver's license (issued in September 2012) on which his address was listed as 275 East 201st Street, apartment 5F. These facts, taken in combination, supplied probable cause to believe that Perez was using apartment 5F to house narcotics or related paraphernalia. *See, e.g.*, *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008) ("In determining whether there is probable cause, our task is 'simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'") (quoting *Gates*, 462 U.S. at 238).

---

known,' or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." *Velardi*, 40 F.3d at 573 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (some citations omitted). In the context of a claim of unlawful search, "[w]here an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, as where a material omission is intended to enhance the contents of the affidavit as support for a conclusion of probable cause, the shield of qualified immunity is lost." *Golino*, 950 F.2d at 871 (citing, *inter alia*, *Malley v. Briggs*, 475 U.S. 335, 344 (1986)).

Calderon, however, argues that South's statements in the affidavit to the effect that he and Sosa had each seen Perez exiting or entering apartment 5F immediately before or after each of the two cocaine sales were false. *See* Pl. Br. 3 n.1 (stating that South "flat out" misled the state-court judge as to these observations). Assuming that South's statements about these observations were both excised from the affidavit, Calderon argues, the remaining allegations would not have supplied probable cause to search apartment 5F, because (1) the only item then tying Perez to apartment 5F would be his driver's license, and (2) the affidavit identified an obvious and far more plausible situs within the building out of which Perez was operating his narcotics business—apartment 5K, which Perez had also been seen entering and/or exiting in close proximity to each transaction.

The SAC's basis for alleging that South lied in claiming that Perez entered or exited apartment 5F appears to be one of physical impossibility. *See, e.g.*, SAC ¶ 31 (stating that it was "not possible" for Perez to have entered the apartment). Specifically, the SAC alleges that Perez did not live in that apartment, *id.* ¶ 1; that a new top lock to that apartment was installed in July 2012 and that Calderon, her husband, and her son were the only persons who had the key to that lock, *id.* ¶ 19; that the key cannot be duplicated without use of a "special card," *id.* ¶ 20; that the building did not have a copy of either the key or the card, *id.* ¶ 21; and that in August 2012, an ADT alarm system was installed in the apartment that was "always on when no one was in the apartment," *id.* ¶ 23. Because Perez "did not have a key and ADT did not report that the apartment's alarm had ever been activated," the SAC alleges, "it was not possible" for Perez to have entered the apartment in August 2013, and therefore, when South claimed to have seen Perez exit apartment 5F and when Sosa (via South) claimed to have seen Perez enter that apartment, those claims were necessarily false, and necessarily knowingly so. *Id.* ¶¶ 30–31.

The SAC, however, does not plead adequate facts to plausibly make it a physical impossibility for Perez to have entered or exited apartment 5F.

With respect to Sosa's report (conveyed in the warrant affidavit by South) that he had seen Perez enter apartment 5F with keys, the SAC's allegations of physical impossibility are quite incomplete. Significantly, South's affidavit for the warrant did not anywhere allege that Sosa saw Perez use a key *to the top lock* of that apartment. The affidavit stated only that Sosa saw Perez "retrieve keys from his pocket, and use the keys to enter Apartment 5F." Siddiqi Decl., Ex. B at ¶ 9. The SAC, however, addresses only the top lock of the apartment. The SAC does not say how many other locks there were in August 2013 to the door of that apartment. And the SAC does not allege that the top lock was consistently or even generally locked (so as to require use of a top-lock key to enter the apartment). Thus, even if the SAC could be read to adequately allege that Perez could not have possessed a top-lock key—and it cannot, *see infra*—the SAC does not allege any facts on which a top-lock key was needed for Perez to unlock the door. Taking the allegations in the SAC as true, Perez could equally have used keys to open another lock or locks on the door. Because Calderon's only basis for claiming that South's statement in the affidavit was knowing or reckless falsity is that the statement described an impossible act, the SAC's pleading is inadequate to the task. Moreover, even if the warrant affidavit were read to attribute to Sosa the statement that Perez was seen unlocking the top lock to the apartment door, the SAC states that only Calderon, her husband, and her son "had the key." It does not allege that none of those persons ever loaned such a key to Perez, who, as the apparent occupant of apartment 5K, was their fifth-floor neighbor.

With respect to South's statement that he personally saw Perez exit apartment 5F, no key of course was need to effect such an exit, and South did not allege that he had seen Perez use any

15

such key. The SAC, tellingly, does not allege that, in August 2013, Perez was never inside that apartment, which is all that would have been needed to make his exit (as observed by South) a physical possibility. Such an allegation is presumably one that, if true, Calderon could easily make, by alleging that neither she, nor her husband, nor her son, had ever permitted Perez entry to the apartment that month, or seen him in the apartment that month. Absent such an allegation, however, there is nothing impossible or even implausible about South's claim to have seen Perez exit the apartment, and therefore no basis on which to conclude that his statement to that effect was false, let alone intentionally or recklessly false. Thus, Calderon fails to make the required "substantial preliminary showing" of a deliberate or reckless falsehood, *Rivera*, 928 F.2d at 604 (quoting *Franks*, 438 U.S. at 155–56), needed to justify excision of this aspect of the affidavit.[5]

In light of the SAC's failure to adequately plead that the search of Calderon's apartment was unlawful, each of her claims must be dismissed. As noted, officers executing a valid search warrant in a home have "the limited authority to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705; *accord Muehler v. Mena*, 544 U.S. 93, 98 (2005) ("An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.") (internal quotation marks and citation omitted). Because Calderon does not allege that her detention exceeded these bounds, her claims for false arrest and wrongful imprisonment

---

[5] Perhaps reflecting awareness of this shortcoming, the SAC at several points incorrectly utilizes a negligence standard to describe the necessary showing, stating that South "knew *or should have known*" that apartment 5F was wrongly identified as Perez's apartment. SAC ¶¶ 48, 49, 50. As noted, however, a negligent misstatement in a warrant is an insufficient basis to challenge a search. *See Franks*, 438 U.S. at 171; *Rajaratnam*, 719 F.3d at 153.

necessarily fail.[6] And Calderon's *Monell* claim also necessarily fails. "*Monell* [*v. Dep't of Social Services*, 436 U.S. 658, 694–95 (1978)] does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006); *see also Kajoshaj v. N.Y.C. Dep't of Educ.*, 543 F. App'x 11, 16–17 (2d Cir. 2013) (summary order) ("Having failed plausibly to plead that DOE employees violated their constitutional rights to equal protection and due process, plaintiffs' *Monell* claim against DOE necessarily fails as well.")   With the Court's having held that Calderon has "failed to establish any constitutional injury, no municipal liability attaches." *Zherka v. DiFiore*, 412 F. App'x 345, 348 (2d Cir. 2011) (summary order).

However, the Court grants Calderon leave to replead one final time.  As the discussion above reflects, the facts on which the physical impossibility of Perez's entry into or exit from apartment 5F might be adequately pled are uniquely in the possession of Calderon (and her husband and son).  Guided by this decision, Calderon may be able, in a Third Amended Complaint, to adequately plead the physical impossibility of the Perez sightings by the detectives as recounted in the warrant affidavit.  If so, the argument would then be available to Calderon that, with the affidavit remedied pursuant to a corrected affidavits inquiry, there was no probable cause to justify a search of apartment 5F.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir.

---

[6] Calderon's cursory description of property damage to her door does not state a claim.  "[I]t is well recognized that 'officers executing search warrants on occasion must damage property in order to perform their duty.'"  *Cody v. Mello*, 59 F.3d 13, 16 (2d Cir. 1995) (quoting *Dalia v. United States*, 441 U.S. 238, 258 (1979)).  "Before any due process liability can be imposed for property damage occurring in a lawful search, it must be established that the police acted unreasonably or maliciously in bringing about the damage."  *Id.*

2000) ("[T]he court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)); *id.* (court should deny "a futile request to replead") (citing *Hunt v. Alliance N. Am. Gov't Income Trust*, 159 F.3d 723, 728 (2d Cir. 1998)).[7]

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss Calderon's SAC, without prejudice to Calderon's right to file a Third Amended Complaint ("TAC"). The Clerk of Court is directed to terminate the motion pending at docket number 26 and to close this case. However, the Clerk shall reopen the case if Calderon files a TAC by May 29, 2015. In the event Calderon files such a pleading, the defendants' response will be due two weeks later. In the event defendants respond with a motion to dismiss, Calderon's brief in opposition will be due two weeks later, and defendants' reply will be due one week after that. If Calderon elects not to file a TAC, the dismissal will then be with prejudice.

---

[7] This case thus contrasts with others where complaints were dismissed with prejudice, presumably because there was no prospect that an amended complaint could call into question the basis for finding probable cause. *See, e.g.*, *Jordan v. Fed. Bureau of Prisons*, No. 09 Civ. 8561 (ALC), 2013 WL 1143617, at *7 (S.D.N.Y. Mar. 19, 2013), *appeal dismissed* (Feb. 4, 2014) (dismissing where complaint "fail[ed] to allege why the[] false statements were necessary to probable cause," and attempted to attack plaintiff's "underlying criminal conviction whose validity cannot be challenged in the absence of expungement, reversal or invalidation") (citing *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994)); *Moore v. City of New York*, No. 08 Civ. 2449 (RRM) (LB), 2011 WL 795103, at *6 (E.D.N.Y. Feb. 28, 2011) (dismissing where complaint contained only a "conclusory and speculative allegation, standing alone, and unsupported by facts"); *Cherry v. Jorling*, 31 F. Supp. 2d 258, 269 (W.D.N.Y. 1998) (dismissing where complaint "made no allegation that [defendant's] testimony . . . during the application for the search warrant contained false information as required by *Franks*").

SO ORDERED.

*Paul A. Engelmayer*
_____
PAUL A. ENGELMAYER
United States District Judge

Dated: May 4, 2015
       New York, New York