```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/5/15
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

MIGUELINA CALDERON,

                                    Plaintiff,

                    -v-

THE CITY OF NEW YORK, JAMES SOUTH,
ALEXANDER SOSA, AND JOHN/JANE DOE 1
THROUGH 10,

                                    Defendants.

---------------------------------------------------------------X

14 Civ. 1082 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

In August 2013, the New York Police Department ("NYPD") developed substantial

evidence that a man named German Perez was trafficking in cocaine out of 275 East 201st

Street, a Bronx apartment building. James South, an NYPD detective, swore out an affidavit

seeking search warrants for apartments 5F and 5K in that building. South attested that he and

Alexander Sosa, also an NYPD detective, had seen Perez use both apartments at various times

immediately before and after selling cocaine to a confidential informant outside the building. He

also attested that, during a car stop, Perez had produced a New York State driver's license

identifying his home address as apartment 5F in that building. A state court judge issued a

warrant to search the two apartments, and NYPD officers then conducted searches pursuant to

these warrants. In apartment 5F, the officers found and handcuffed plaintiff Miguelina Calderon,

but the search of that apartment yielded no evidence of Perez, drug-dealing, or other criminal

activity. In apartment 5K, the officers found and arrested Perez and seized drugs.

Calderon now brings this action under 42 U.S.C. § 1983 and state law, against, *inter alia*, the City of New York ("the City"), South, and Sosa. She alleges that South knowingly or recklessly made false statements in his affidavit seeking authority to search apartment 5F. In particular, she claims that South and Sosa falsely represented that they had seen Perez entering and exiting apartment 5F shortly before and after selling drugs outside the building, and that a magistrate presented with an accurate affidavit would not have issued the search warrant. She alleges that she was falsely arrested and wrongfully imprisoned as a result of the unjustified search of her apartment. She further alleges that the City failed to properly train and discipline its officers with respect to proper practices in seeking search warrants. Calderon seeks compensatory damages of $1 million, plus punitive damages.

Defendants move to dismiss Calderon's Third Amended Complaint ("TAC") as to all claims. For the reasons that follow, the Court denies the motion as to the claims against South and Sosa, and grants the motion as to all other claims, including the claim of municipal liability.

## I.    Background[1]

### A.    The Parties

Calderon resides in apartment 5F of 275 East 201st Street ("the building") in the Bronx. TAC ¶ 6. She has lived there since July 2012 with her husband and son. *Id.* ¶ 21.

Calderon has sued 13 defendants. *Id.* ¶¶ 7–17. The first, the City, is responsible for the NYPD. The second, South, swore out an affidavit in which he stated, *inter alia*, that he had

---

[1] For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts in the Third Amended Complaint, Dkt. 40 ("TAC"), to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court also considers "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *accord Halebian v. Berv*, 644 F.3d 122, 130 n.7 (2d Cir. 2011).

personally seen Perez, a narcotics trafficking suspect, exit apartment 5F shortly before selling cocaine to a confidential informant outside the building. *See* Dkt. 46 ("Siddiqi Decl."), Ex. B, ¶ 8. The third, Sosa, informed South that he had seen Perez enter apartment 5F immediately after another such sale. *Id.* ¶ 9. The other defendants are 10 John or Jane Does—police officers and detectives "whose identities are currently unknown who are members of the NYPD who took place [sic] in the incident described herein." TAC ¶ 17. South, Sosa, and the 10 Does are sued in their individual and official capacities. *Id.* ¶¶ 9, 13, 17.

### B.      Calderon's Occupancy of Apartment 5F Before the August 27, 2013 Search

In or about June 2012, Calderon signed a lease with her landlord for apartment 5F. *Id.* ¶ 20. In or about July 2012, she moved into apartment 5F with her husband and her son. *Id.* ¶ 21. No one else lived with them. *Id.* In July 2012, the Con Edison bill was put in Calderon's name. *Id.* ¶ 23.

Calderon alleges that the apartment has only one door. *Id.* ¶ 22. At the time Calderon moved in, the door had a lower lock, but in July 2012, she "installed a top lock and only [she], her husband, and her son had the key" to this top lock. *Id.* ¶¶ 24–25. It was the "custom and practice" of each of these three individuals "to always lock the top lock when leaving the apartment," *id.* ¶ 34, and they in fact always did so. *Id.* ¶¶ 35–36. The top-lock key could not be duplicated without a "special card." *Id.* ¶ 26. Calderon alleges that there is only one card, it has never been loaned or given to anyone outside the family, and the building did not have a copy of either the top-lock key or the special card. *Id.* ¶¶ 26–27. She, her husband, and her son never lost their keys or loaned them to anyone else, *id.* ¶¶ 28–29, including Perez, whom they do not know. *Id.* ¶¶ 30–31. Calderon further alleges that she, her husband, and her son never "saw anyone named German Perez" in their apartment and "never permitted anyone named German

Perez" into the apartment during the time they have resided there. *Id.* ¶¶ 32–33. Finally, in August 2012, "ADT installed an alarm system that covered, among other places, the entrance/exit door to the apartment." *Id.* ¶ 38. This alarm "was always turned on when no one was in the apartment." *Id.* ¶ 39. If the alarm were activated, ADT would notify Calderon by phone before contacting the authorities, *id.* ¶ 41, and ADT did not so notify Calderon, her husband, or her son during "the period set forth in SOUTH's search warrant application." *Id.* ¶ 42.

### C.   Detective South's Affidavit in Support of a Search Warrant

On August 22, 2013, South swore out a seven-page affidavit in support of warrants to search apartments 5F and 5K. *See* Siddiqi Decl., Ex. B. In it, South stated, among other things, the following[2]:

1. In approximately May 2013, NYPD's Narcotics Borough Manhattan North unit began investigating narcotics activity at 275 East 201st Street. *Id.* ¶ 4.

---

[2] Calderon contests the truthfulness of some statements made in the affidavit, but not the fact that South made them. Indeed, Calderon's TAC relies on the fact that these statements, some of which she claims were false, were made to secure the warrant to search apartment 5F. *See, e.g.*, TAC ¶ 49 ("The information that SOUTH provided to the Court about Perez entering and exiting the apartment was false . . . ."). It is therefore proper to consider, on defendants' motion to dismiss, the statements made in the affidavit, for the fact that they were made to secure the warrant. *See generally Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) ("'[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.' Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)) (citations omitted); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). On this basis, the Court has considered the affidavits to search apartments 5F and 5K, and the resulting warrants that issued to search those apartments. *See* Siddiqi Decl., Exs. B–E.

2.  On two occasions in August 2013, South conducted "controlled" purchases using a confidential informant ("CI"), *id.* ¶¶ 8, 9, who had a history of reliability, *id.* ¶ 5. In each case, the CI purchased cocaine from a man inside a Ford Explorer parked outside of 275 East 201st Street. *Id.* ¶¶ 8, 9. Before each purchase, the drug dealer emerged from within 275 East 201st Street. *Id.* After each purchase, the CI exited the Ford Explorer and met South, whereupon the CI handed South a plastic twist bag containing a white powdered substance. *Id.* Field tests were positive for cocaine each time. *Id.* ¶¶ 8a, 9a.

3.  After a car stop (the timing of which was not revealed), South identified the drug seller as German Perez. *Id.* ¶ 7. Perez showed South a New York State driver's license bearing the name "German Perez" and the address of "275 East 201st Street, Apartment 5F." *Id.*

4.  As to the first purchase, after giving the CI money to buy drugs, South went to a stairwell within 275 East 201st Street, "overlooking the fifth floor." *Id.*, Ex. B, ¶ 8. From that position, South "observed Perez exit Apartment 5F, retrieve keys from his pocket, and use the keys to enter Apartment 5K." *Id.* South "then observed Perez exit Apartment 5K and enter an elevator. A few minutes later, [South] observed Perez exit an elevator on the fifth floor of 275 East 201st Street, retrieve keys from his pocket, and use the keys to enter Apartment 5K." *Id.* When South returned to his vehicle, the CI handed him a plastic bag containing cocaine. *Id.* The CI reported to South that he had seen Perez exit 275 East 201st Street before entering the Ford Explorer, where Perez sold the cocaine to the CI. *Id.*

5. As to the second purchase, after giving the CI money to buy drugs, South, while near 275 East 201st Street, "observed Perez driving a grey Ford Explorer," parking the Ford Explorer in front of 275 East 201st Street, and entering that building. *Id.* ¶ 9. South was "informed by Detective Alexander Sosa . . . who was located on the fifth floor of 275 East 201st Street, that he observed Perez exit an elevator on the fifth floor of [the building], remove keys from his pocket, and use the keys to enter Apartment 5K. Detective Sosa then observed Perez exit Apartment 5K and enter the elevator." *Id.* South "then observed Perez exit 275 East 201st Street and enter the Ford Explorer. [South] observed [the] CI enter the Ford Explorer and exit a short time later. [South] then observed Perez park the Ford Explorer a short distance away, exit the Ford Explorer, and enter 275 East 201st Street." *Id.* Sosa informed South "that, a few moments later, he observed Perez exit the elevator on the fifth floor of 275 East 201st Street, retrieve keys from his pocket, and use the keys to enter Apartment 5F." *Id.* Around that time, the CI again handed South a plastic bag containing cocaine. *Id.*

6. Apartments 5F and 5K are located on the same floor, but are on different sides of the hallway. Each door has a clearly marked apartment number. *Id.* ¶ 11.

On August 22, 2013, on the basis of South's affidavit, the Hon. Steven M. Statsinger of the Criminal Court of the City of New York issued no-knock search warrants for apartments 5F and 5K. *Id.*, Ex. D. The warrants authorized the officers to search for (among other things) cocaine, proceeds from drug trafficking, and the person of German Perez. *Id.*

On August 26, 2013, South presented a modified affidavit to correct a typographical error pertaining to the borough of the premises (the original affidavit mistakenly said "New York,

New York," not "Bronx, New York"). *Id.*, Ex. D, ¶ 3.  On the same date, Judge Statsinger issued

a search warrant based on the corrected affidavit.  *Id.*, Exs. D–E.

### D.      The August 27, 2013 Search and Aftermath

On August 27, 2013, unidentified NYPD officers went to Calderon's apartment, 5F, to

execute the search warrant.  She was inside the apartment when, between 3 and 4 p.m., she heard

banging at the door as she was leaving the shower.  TAC ¶ 53.  She "grabbed a towel and looked

through the peephole" of the door, where she saw "people in dark clothing breaking down her

door." *Id.*  She "opened her door and the police entered waiving [sic] a piece of paper." *Id.* ¶ 54.

She was handcuffed while wearing only a towel; she did not consent to being handcuffed.  *Id.*

¶¶ 55–56.  The handcuffs were momentarily removed to permit Calderon to clothe herself in the

presence of a female officer.  *Id.* ¶ 57.  Police then showed Calderon a photocopy of Perez's

driver's license (which showed his address as apartment 5F, *see* Siddiqi Decl., Ex. C); Calderon

replied that he did not live in the apartment.  *Id.* ¶ 58.  An officer told Calderon that Perez still

paid her Con Edison bill; Calderon responded that this was impossible because she had been

living in the apartment for 13 months and the bill was in her name.  *Id.* ¶ 60.  Calderon also

"informed the police that the building's Superintendent had previously told her that a lady who

used to live in the apartment [*i.e.*, apartment 5F] now lived in apartment 5K." *Id.* ¶ 62.  The

police then went to apartment 5K "and arrested Perez and seized drugs." *Id.* ¶ 63.  No evidence

of contraband was found in apartment 5F.  *Id.* ¶ 65.  Calderon "was eventually released from

custody." *Id.* ¶ 66.  When entering Calderon's apartment, the police officers damaged her door;

the door was not repaired by the Superintendent for three days, during which time Calderon was

"confined to her apartment." *Id.* ¶ 76.

### E.      Procedural History

#### 1.      Initial History

On February 20, 2014, Calderon filed a Complaint.  Dkt. 2.  On May 9, 2014, the City

answered.  Dkt. 4.  On November 5, 2014, after settlement discussions pursuant to the District's

§ 1983 Plan, and after an initial pretrial conference, Dkt. 18, Calderon filed a First Amended

Complaint ("FAC").  Dkt. 19.  On December 15, 2014, Calderon sought leave to file a Second

Amended Complaint ("SAC"), Dkt. 21, which the Court granted, Dkt. 23.  On December 19,

2014, Calderon filed the SAC.  Dkt. 25.

The SAC brought four causes of action: (1) a § 1983 claim against South and the Doe

officers for wrongful arrest and false imprisonment during the execution of the search warrant;

(2) a municipal-liability claim against the City, based on its alleged failure to train, supervise,

and discipline employees with respect to obtaining search warrants; (3) a state-law claim,

mirroring the § 1983 claim, for false arrest and imprisonment; and (4) a claim for attorneys' fees

under 42 U.S.C. § 1988.  *See* SAC at 9–16.

On January 9, 2015, defendants moved to dismiss.  Dkt. 26.  The Court received briefing

and heard argument on that motion.

#### 2.      May 4, 2015 Decision Granting Motion to Dismiss

On May 4, 2015, the Court granted defendants' motion to dismiss without prejudice to

Calderon's right to file a Third Amended Complaint.  Dkt. 34, *reported at Calderon v. City of

New York*, No. 14 Civ. 1082 (PAE), 2015 WL 2079405 (S.D.N.Y. May 4, 2015).

The Court reasoned that Calderon's claims turned on whether the search of her apartment

was lawful because it is well established that officers may briefly detain occupants of an

apartment during a lawful search, *see Michigan v. Summers*, 452 U.S. 692, 705 (1981), and

Calderon did not allege that a lawful search was improperly executed (*e.g.*, that she was detained for too long during the search). *See Calderon*, 2015 WL 2079405, at *4.  Calderon asserted that the search was unlawful because South knowingly or recklessly made false statements in his application for a search warrant, and, relying on those false statements, Judge Statsinger found probable cause and issued the search warrant. *See, e.g.*, SAC ¶¶ 1, 48, 55, 57, 60.

The Court found that Calderon had inadequately pled that the search of her apartment was unlawful because the facts she alleged, accepted as true for the purpose of the motion to dismiss, did not plausibly show that South knowingly or recklessly made false statements to the effect that Perez had been seen entering and exiting apartment 5F.  The facts alleged in the SAC were inadequate to this task because they did not "plausibly make it a physical impossibility for Perez to have entered or exited apartment 5F." *Calderon*, 2015 WL 2079405, at *8.

The Court nevertheless granted Calderon leave to replead "one final time," noting that she, her husband, and her son "are uniquely in the possession" of facts that might adequately plead the physical impossibility of Perez's presence in apartment 5F. *Id.* at *9.

### 3.    Subsequent History

On May 20, 2015, Calderon filed a Third Amended Complaint ("TAC").  Dkt. 40.  On June 12, 2015, defendants filed a motion to dismiss the TAC, Dkt. 45, and filed a supporting memorandum of law, Dkt. 47 ("Def. Br."), and an accompanying declaration, Dkt. 46 ("Siddiqi Decl.").  On June 26, 2015, Calderon filed an opposition brief.  Dkt. 48 ("Pl. Br.").  On July 8, 2015, defendants filed a reply brief.  Dkt. 51 ("Def. Reply Br.").

The TAC brings the same four causes of action as the SAC: (1) a § 1983 claim against South and the Doe officers for wrongful arrest and false imprisonment during the execution of the search warrant; (2) a municipal-liability claim against the City, based on its alleged failure to

train, supervise, and discipline employees with respect to obtaining search warrants; (3) a state-law claim, mirroring the § 1983 claim, for false arrest and imprisonment; and (4) a claim for attorneys' fees under 42 U.S.C. § 1988. *See* TAC at 12–20.

## II.   Legal Standards Governing Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*).

III.     **Discussion**

The Court considers first whether the TAC adequately pleads that the warrant was improperly procured so as to make the resulting search unlawful.  It is well established that officers may briefly detain occupants of an apartment during a lawful search, *see Summers*, 452 U.S. at 705, so the unlawfulness of the search is a necessary predicate to Calderon's claims of false arrest and imprisonment.  Finding that Calderon has adequately pled the unlawfulness of the search based on false statements in the affidavit, the Court then considers the other elements of her claims.

A.     **Lawfulness of the Warranted Search of Calderon's Apartment**

Where a search has been conducted pursuant to a court-authorized warrant, "great deference" is due to a magistrate's determination that there is probable cause to search a premises.  *United States v. Leon*, 468 U.S. 897, 914 (1984) (citations omitted).  "Normally, the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause."  *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (citing *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

Deference to the magistrate's finding of probable cause, however, "is not boundless," *Leon*, 468 U.S. at 914, and while a party challenging a warrant on the ground that it was issued on less than probable cause bears a "heavy burden," *Golino*, 950 F.2d at 870, that burden can be met.  In particular, it is appropriate to inquire whether the affidavit on which the probable cause determination was based was knowingly or recklessly false.  Under *Franks v. Delaware*, 438 U.S. 154 (1978), a criminal defendant who seeks to suppress the fruits of a search warrant must show that (1) the affiant knowingly and intentionally, or with a reckless disregard of the truth,

11

made false statements or omissions in his application for a warrant, and (2) such statements or omissions were necessary to the finding of probable cause. *Id.* at 155–56; *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005); *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000).

This same standard applies in civil cases, like this one, brought pursuant to § 1983, in which a plaintiff seeks to challenge a warranted search as unlawful. *See, e.g.*, *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994) (citing *Franks*, 438 U.S. at 171–72; *Golino*, 950 F.2d at 870– 71); *Magnotti v. Kuntz*, 918 F.2d 364, 368 (2d Cir. 1990) (applying *Franks* standard to issues of qualified immunity in § 1983 action). In such cases, a plaintiff must make a "substantial preliminary showing" that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a material false statement in applying for the warrant. *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991) (quoting *Franks*, 438 U.S. at 155). "Unsupported conclusory allegations of falsehood or material omission" cannot support a challenge to the validity of the warrant; rather, the plaintiff must make "specific allegations" supported by an offer of proof. *Velardi*, 40 F.3d at 573. The *Franks* standard is, thus, "a high one." *Rivera*, 928 F.2d at 604.

### 1. First *Franks* Element: Knowing Falsity or Reckless Disregard for Truth

As to the first *Franks* element, it is insufficient for a plaintiff to allege that there were *errors* in the affidavit, as "misstatements or omissions caused by 'negligence or innocent mistake[s]'" do not establish falsity or reckless disregard. *United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2820 (2014) (quoting *Franks*, 438 U.S. at 171); *accord Illinois v. Rodriguez*, 497 U.S. 177, 184 (1990) ("If a magistrate, based upon seemingly reliable but factually inaccurate information, issues a warrant for the search of a house in which the sought-after felon is not present, has never been present, and was never likely to have been

12

present, the owner of that house suffers one of the inconveniences we all expose ourselves to as

the cost of living in a safe society; he does not suffer a violation of the Fourth Amendment.").

Instead, it must be alleged that any misrepresentations or omissions were "designed to mislead,

or that [they were] made in reckless disregard of whether they would mislead." *Rajaratnam*, 719

F.3d at 154 (quoting *United States v. Awadallah*, 349 F.3d 42, 68 (2d Cir. 2003)) (emphasis

omitted).

Considered on its face, South's application for a search warrant for apartment 5F clearly

articulated probable cause to believe that evidence or proceeds of narcotics trafficking would be

found in that apartment.  There were three pieces of information connecting apartment 5F to

Perez: (1) South attested that he had seen Perez exit apartment 5F prior to the first cocaine sale;

(2) South attested that Sosa told him that Sosa had observed Perez enter apartment 5F using keys

following the second sale; and (3) during a car stop, Perez had produced a driver's license on

which his address was listed as 275 East 201st Street, Apt. 5F.  As this Court previously held,

"[t]hese facts, taken in combination, supplied probable cause to believe that Perez was using

apartment 5F to house narcotics or related paraphernalia." *Calderon*, 2015 WL 2079405, at *7.

Throughout this litigation, Calderon has primarily attacked the veracity of the first two

pieces of evidence, arguing that South must have knowingly or recklessly made false statements

in the affidavit because it was impossible for Perez to have been seen entering or exiting

apartment 5F.  As described above, the Court granted the motion to dismiss the SAC on the

grounds that Calderon had inadequately pled such physical impossibility.  The Court highlighted

certain facts that, if properly pled, might strengthen a plausible claim of physical impossibility.

Specifically, the Court noted that the following factual assertions were missing from the SAC:

13

1. That the top lock was consistently locked, such that an individual seeking to enter apartment 5F would need the top-lock key that Calderon claimed no one outside her immediate family possessed;

2. That Perez could not have possessed a top-lock key because, among other things, Calderon, her husband, and her son had never given or loaned a key to Perez; and

3. That Calderon, her husband, and her son had never let Perez into the apartment or seen him there in August 2013.

*See Calderon*, 2015 WL 2079405, at *8.

The TAC has now filled each of these gaps. Specifically, it pleads the following facts, which were not pled in the SAC:

1. That it was the "custom and practice" of Calderon, her husband, and her son "to always lock the top lock when leaving the apartment," TAC ¶ 34, and they always did so, *id.* ¶¶ 35–36;

2. That Calderon, her husband, and her son never lost their keys or loaned them to anyone else, *id.* ¶¶ 28–29, including, specifically, German Perez, whom they do not know, *id.* ¶¶ 30–31;

3. That Calderon, her husband, and her son never "saw anyone named German Perez" in their apartment and "never permitted anyone named German Perez" into their apartment during the time they have resided there, *id.* ¶¶ 32–33.

Defendants argue that Calderon has still not adequately pled physical impossibility because the TAC does not state that "there was no method or fashion in which German Perez could have gained access to the Apartment" after Calderon and her family moved in. Def. Br. 9–10. Specifically, defendants fault the TAC for failing to plead that Perez could not have picked

14

the locks on the apartment and that he did not have the code needed to disable the ADT system. *Id.* at 10. But these conjectural scenarios, which defendants concede are "attenuated," *id.*, do not render the TAC inadequate. *Iqbal* and *Twombly* do not require the pleading "of facts which can have no conceivable other explanation, no matter how improbable that explanation may be." *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 360 (2d Cir. 2013). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Here, while the SAC had major holes, the TAC has closed them, leaving open only improbable scenarios in which Perez could have been present in apartment 5F in August 2013. Taking the pleadings as true, the inference that Perez was never in, and could not have been seen entering and exiting, the apartment is "reasonable."

Defendants further argue that Calderon failed to plead that Perez was never in the apartment, only that she and her immediate family members never *saw* him there and never permitted him entry. Def. Br. 10–11. Such a pleading was not required. Although the Court's prior decision noted that the SAC had failed to allege that Perez was never inside the apartment, *see Calderon*, 2015 WL 2079405, at *8, it immediately clarified that this allegation "is presumably one that, if true, Calderon could easily make, by alleging that neither she, nor her husband, nor her son, had ever permitted Perez entry to the apartment that month, or seen him in the apartment that month." *Id.* The TAC makes precisely such allegations. Calderon was not required to allege what she cannot possibly know—that it is metaphysically impossible for Perez to have been in apartment 5F on the relevant dates—in order to raise a "reasonable inference" that this was so.

Calderon has therefore adequately pled that it was physically impossible for Perez to have entered or exited apartment 5F in August 2013, and thus that South's statements to that effect were knowingly or recklessly false.

### 2.     Second *Franks* Element: Necessity or Materiality

As to the second *Franks* element, a false statement is material when "the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding." *Martin*, 426 F.3d at 73 (quoting *Awadallah*, 349 F.3d at 64–65). Courts assess materiality using the "corrected affidavits" approach. *McColley v. Cty. of Rensselaer*, 740 F.3d 817, 823 (2d. Cir. 2014) (citing *Escalera v. Lunn*, 361 F.3d 737, 743–44 (2d Cir. 2004)). A court looks "to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, based on [all] existing facts known to the applicant," would have sufficed to support probable cause. *Escalera*, 361 F.3d at 743 (citing *Franks*, 438 U.S. at 171–72; *Loria v. Gorman*, 306 F.3d 1271, 1289 (2d Cir. 2002); *Smith v. Edwards*, 175 F.3d 99, 105 (2d Cir. 1999)). A statement is not material if, after eliminating it, the corrected affidavit would still have supported a finding of probable cause. *See Velardi*, 40 F.3d at 573–74 (citing *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993); *Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir. 1992)).

In conducting the corrected affidavit inquiry, as in assessing a search warrant application in the first instance, a court is not to be overly strict or technical in assessing whether there is probable cause. A judge must instead "simply . . . make a *practical, common-sense* decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a *fair probability* that contraband or evidence of a crime will be found in a particular place." *Martin*, 426 F.3d at 74

(quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)) (internal quotation marks omitted) (emphasis in *Martin*).

Applying these principles to the South affidavit, the Court holds that the allegedly false statements to the effect that Perez had entered and exited apartment 5F were necessary to the probable cause determination.  A corrected affidavit that omitted these statements would not have supported probable cause.  The corrected affidavit would still have included information about Perez's driver's license,[5] which listed his address as apartment 5F.  But the license alone would not have provided probable cause to search apartment 5F because it could not, on its own, establish a nexus between that apartment and Perez's apparent crimes, given the formidable evidence linking Perez's drug-dealing to a different apartment in the building—5K.

"To establish probable cause to search a residence, two factual showings are necessary— first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence," *i.e.*, a nexus between the crime and the place to be searched.  *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983).  "A showing of nexus does not require direct evidence and 'may be based on reasonable inference from the facts presented based on common sense and experience.'" *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (quoting *United States v. Buck,* No. 84 Cr. 220 (CSH), 1986 WL 12533, at \*4 (S.D.N.Y. Oct. 24, 1986)).

---

[5] It is appropriate to consider the license on a motion to dismiss.  South's affidavit quoted the license as stating that Perez's address was apartment 5F, and the TAC does not allege that South misquoted the license, let alone that he did so recklessly or knowingly.  Nor does the TAC allege that South knew of, but did not disclose, facts making the address information on the license stale.  It was reasonable for the state court judge, in making the probable cause determination, to consider the facts recited on the license, especially given the apparently "ongoing and long-term nature" of Perez's criminal activity.  *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (finding information over 20 months old not stale).

Applying these standards, courts have upheld search warrants for the homes of suspected drug dealers based on little more than the combination of (1) evidence of drug crimes outside the home, (2) evidence identifying the suspected dealer's home address, and (3) general statements in the search warrant affidavit to the effect that, in the affiant's experience, drug dealers are likely to keep evidence of their crimes in their homes. *See, e.g., United States v. Benevento*, 836 F.2d 60, 70 (2d Cir. 1987) (probable cause to search home existed where affidavits contained, *inter alia*, testimony of DEA agent "that, based upon his extensive experience in drug enforcement investigations, it was his opinion that drug traffickers . . . were likely to keep various items of evidence of drug-related activity . . . in their personal homes"); *United States v. Cruz*, 785 F.2d 399, 405 (2d Cir. 1986) (probable cause to search infrequently used apartment of suspected drug dealer existed where, *inter alia*, affiant "ventured his opinion that, based upon his experience, narcotics dealers 'customarily' maintain apartments and other locations apart from their residences in furtherance of their business").

However, several district courts in this Circuit have held that, where there is no evidence linking a defendant's residence to criminal activity and the affiant has merely predicted based on experience that drug paraphernalia will be found there, there is no probable cause to search that residence. *See United States v. Kortright*, No. 10 Cr. 937 (KMW), 2011 WL 4406352, at *7 (S.D.N.Y. Sept. 13, 2011) (distinguishing *Benevento* because it involved "some 'other' evidence . . . that connected the defendants' criminal activity to the premises to be searched"); *United States v. Moran*, 349 F. Supp. 2d 425, 476 (N.D.N.Y. 2005) ("[M]ere residence by a suspect does not constitute a fair probability that evidence of the criminal activity will be found there."); *United States v. Guzman*, No. 97 Cr. 786 (SAS), 1998 WL 61850, at *2 (S.D.N.Y. Feb. 13, 1998) (finding no probable cause even when the affidavit included "general averments based

18

on [the affiant's] training and experience"); *United States v. Rios*, 881 F. Supp. 772, 775–76 (D.

Conn. 1995) (same); *United States v. Gomez*, 652 F. Supp. 461, 463 (E.D.N.Y. 1987) (same).

Although courts outside the Second Circuit have sometimes upheld search warrants for a

narcotics suspect's residence even when the supporting affidavits recited neither evidence

linking the residence to narcotics trafficking nor an affiant's statement that his experience

supported inferring the presence of narcotics paraphernalia, *see, e.g.*, *United States v. Williams*,

974 F.2d 480, 481–82 (4th Cir. 1992), the Court need not choose between its fellow district

courts and these out-of-Circuit authorities.  That is because, here, not only did South's affidavit

lack these recitations, it revealed an obvious *alternative* base for Perez's narcotics activity—

apartment 5K.  This circumstance significantly weakened the logical nexus between apartment

5F and the suspected criminal activity.  Specifically, if the claims that Perez was seen entering

and exiting apartment 5F had been excised from the affidavit, Judge Statsinger would have been

left with the following relevant facts:

1. A reliable confidential informant participated in two controlled drug buys outside of
   275 East 201st Street.

2. Officers observed Perez coming to and going from an apartment—apartment 5K—on
   the fifth floor of 275 East 201st Street immediately before and after the drug buys.

3. German Perez produced a New York State driver's license that identified his address
   as 275 East 201st Street, Apt. 5F.

4. Apartment 5K and apartment 5F are on the same floor of that building on opposite
   ends of the hallway.

Based on this evidence, Judge Statsinger could not have properly found probable cause to

believe that apartment 5F contained evidence of narcotics trafficking.  Rather, he rationally could

have concluded only that, even if Perez resided in apartment 5F, he operated his drug business out of apartment 5K.  Absent any evidence regarding apartment 5F other than as appeared on Perez's driver's license, the nexus between apartment 5F and Perez's drug-dealing was simply too tenuous to support probable cause for a search.

In an alternative argument, defendants point out that the warrant affidavit sought not only narcotics, paraphernalia, and marked currency, but also the right to search German Perez himself, if found on the premises, for such items.  Def. Br. 12 (citing Siddiqi Decl., Ex. B, at 6). They argue that "it would be abundantly reasonable to believe that Perez would be found at the address listed on his valid driver's license." *Id.* at 13.  But it does not follow that, because Perez might be found in apartment 5F, narcotics or other drug paraphernalia would be found on his person while there.  The corrected affidavit supplied no more basis to so infer than that narcotics were elsewhere in apartment 5F.  Notably, the officers did not have an arrest warrant for Perez. And a search warrant covers places, not people.  "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978).  That the warrant authorized a search of Perez if found on the subject premises did not substitute for a showing of probable cause to search those premises.

Therefore, the Court holds, a corrected affidavit lacking references to Perez's entering and exiting apartment 5F would not have supported probable cause to search that apartment.  The allegedly false statements were thus "necessary" and "material" to the finding of probable cause, and the second *Franks* element is satisfied.  Accordingly, Calderon has adequately pled that the

search of her apartment was unlawful.  The Court proceeds to consider the other elements of her

causes of action.[7]

### B.    Other Elements of Calderon's False Arrest/Imprisonment Claim

To plead a cause of action for false arrest or false imprisonment[8] under New York law, a

plaintiff must plausibly allege that: "(1) the defendant intended to confine the plaintiff, (2) the

plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement,

and (4) the confinement was not otherwise privileged."  *Savino v. City of New York*, 331 F.3d 63,

75 (2d. Cir. 2003) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)) (internal

quotation marks omitted).  The same elements govern Calderon's federal claim, because in

analyzing § 1983 claims for unconstitutional false arrest, courts generally look to the law of the

state in which the arrest occurred, *Jaegly v. Couch*, 439 F.3d 149, 151–52 (2d Cir. 2006) (citing

*Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)), and the elements of a claim of false arrest

under § 1983 have been held "substantially the same" as the elements of a false arrest claim

under New York law.  *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992).  The Court henceforth

refers to Calderon's claims collectively as alleging "false arrest."

---

[7] Defendants also raise a qualified immunity defense, under which, "[a]s government officials
performing discretionary functions, the defendants enjoy a qualified immunity that shields them
from personal liability for damages under section 1983 'insofar as their conduct does not violate
clearly established statutory or constitutional rights of which a reasonable person would have
known,' or insofar as it was objectively reasonable for them to believe that their acts did not
violate those rights."  *Velardi*, 40 F.3d at 573 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818
(1982)) (citation omitted).  But, in the context of a claim of unlawful search, "[w]here an officer
knows, or has reason to know, that he has materially misled a magistrate on the basis for a
finding of probable cause . . . the shield of qualified immunity is lost."  *Golino*, 950 F.2d at 871
(citing, *inter alia*, *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986)).

[8] "False arrest and false imprisonment claims are identical in New York."  *Leon v. City of New
York*, No. 09 Civ. 8609 (WHP), 2010 WL 2927440, at *4 (S.D.N.Y. July 1, 2010) (citing *Posr v.
Doherty*, 944 F.2d 91, 96 (2d Cir. 1991)).

Here, Calderon has adequately pled that defendants intended to confine her, that she was

conscious of the confinement, and that she did not consent to it. *See* TAC ¶ 56. As to the final,

lack-of-justification element, "[t]he existence of probable cause to arrest constitutes justification

and is a complete defense to an action for false arrest" under both state and federal law. *Weyant*

*v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal quotation marks and citation omitted). But

here, there was no probable cause to detain Calderon. And the principle that officers may

"detain the occupants of the premises while a proper search is conducted," *Summers*, 452 U.S. at

705, does not avail defendants, because Calderon has adequately pled that the search was

unlawful, and detention during the execution of an unlawfully obtained search warrant is

actionable under § 1983. *See, e.g.*, *Olson v. Oreck*, No. 06 Civ. 2064 (MCE) (CMK), 2008 WL

149976, at *9 (E.D. Cal. Jan. 14, 2008), *report and recommendation adopted*, 2008 WL 478416

(E.D. Cal. Feb. 19, 2008) ("[W]hile defendants are correct that detention during the execution of

a *valid* warrant is not actionable under § 1983, detention during execution of an *invalid* warrant

may be.") (emphasis in original); *see also Green v. City of Mount Vernon*, No. 10 Civ. 707

(KMK), 2015 WL 1455701, at *18 (S.D.N.Y. Mar. 31, 2015) (noting that although "[d]efendants

would be acting lawfully if they detained Green incident to a valid search warrant or would be

shielded by qualified immunity if they acted with good faith reliance on the apparently valid

warrant," once the search became unconstitutional, "continued confinement of Green during that

unconstitutional search was no longer constitutional, nor could a reasonable officer think

otherwise").

Defendants alternatively suggest that Calderon's temporary detention may not have risen

to the level of confinement. *See* Def. Br. 14–15. On the pleadings, that is clearly wrong. Under

both federal and New York law, a plaintiff need not have been formally arrested to claim false

arrest. *See Jaegly*, 439 F.3d at 151 (§ 1983 claim extends to "unreasonable seizures"); *Posr v.*

*Doherty*, 944 F.2d 91, 96 (2d Cir. 1991) (New York law); *see also Broughton v. State*, 37 N.Y.2d

451, 456 (1975) ("Whenever a person unlawfully obstructs or deprives another of his freedom to

choose his own location, that person will be liable for that interference.").

　　Here, the TAC alleges that officers banged on Calderon's door "as she was exiting the

shower," were in the process of "breaking [it] down" when she opened it, handcuffed her while

she "was still wearing only a towel," removed the handcuffs temporarily so she could get

changed in a female officer's presence, then handcuffed her again and questioned her. *See* TAC

¶¶ 53–62. Confining and handcuffing an individual in her home, even where falling short of an

arrest, is a seizure. *See Summers*, 452 U.S. at 696 (requiring occupant to re-enter the premises

and remain there during search was a seizure under the Fourth Amendment); *United States v.*

*Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of

a formal arrest."); *Stewart v. United States*, 101 F.3d 1392 (2d Cir. 1996) (Fourth Amendment

seizure not disputed where plaintiffs had been handcuffed during search of their home).

　　The TAC therefore adequately pleads false arrest. Defendants' motion to dismiss

Calderon's first and third causes of action—for false arrest under § 1983 and New York state

law—is denied.[9]

---

[9] Calderon also alleges property damage to her door. *See* TAC ¶ 76. "Victims of unreasonable
searches or seizures may recover damages directly related to the invasion of their privacy—
including (where appropriate) . . . property damage . . . ." *Townes v. City of New York*, 176 F.3d
138, 148 (2d Cir. 1999). However, "[a] claim for deprivation of property cannot lie in federal
court if the state courts provide an adequate remedy for the deprivation of that property." *Smith
v. O'Connor*, 901 F. Supp. 644, 647 (S.D.N.Y. 1995) (citing, *inter alia, Hudson v. Palmer*, 468
U.S. 517, 533 (1984)). Defendants point out that Calderon failed to allege exhaustion, but do not
specifically identify the state-law remedial process she was supposed to, but failed to, pursue.
*See* Def. Br. 18–19. The Court therefore declines, for the time being, to dismiss Calderon's
claim of property damage, without prejudice to the defendants' right to make a proper showing
of non-exhaustion at a later stage of this case.

### C.   *Monell* Claim

In granting defendants' motion to dismiss the SAC, the Court held that, because Calderon

had failed to plead a plausible constitutional violation, municipal liability under *Monell v.*

*Department of Social Services*, 436 U.S. 658 (1978), was necessarily foreclosed. *See Calderon*,

2015 WL 2079405, *9 (citing, *inter alia*, *Zherka v. DiFiore*, 412 F. App'x 345, 348 (2d Cir.

2011) (summary order) (where plaintiff "fail[s] to establish any constitutional injury, no

municipal liability attaches")).  Having now held that Calderon's TAC adequately pleads a

constitutional violation, the Court must consider the *Monell* claim.  For the reasons that follow,

defendants' motion to dismiss the *Monell* claim is granted.

### 1.   Legal Standards for Alleging Municipal Liability

"[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a

plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2)

causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New*

*York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir.

1983)) (internal quotation marks omitted).

There are four ways to establish the existence of an official policy or custom, the first

element of a *Monell* claim.  A plaintiff may plead that the constitutional violation was caused by:

"(1) a formal policy officially endorsed by the municipality; (2) actions taken by government

officials responsible for establishing the municipal policies that caused the particular deprivation

in question; (3) a practice so consistent and widespread that, although not expressly authorized,

constitutes a custom or usage which a supervising policy-maker must have been aware; or (4)

a failure by policymakers to provide adequate training or supervision to subordinates to such an

extent that it amounts to deliberate indifference to the rights of those who come into contact with

the municipal employees." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted); *see also Spears v. City of New York*, No. 10 Civ. 3461 (JG), 2012 WL 4793541, at *11 (E.D.N.Y. Oct. 9, 2012).

Plaintiffs alleging the existence of a municipal policy or custom often point to the filing of other complaints and/or lawsuits bringing similar claims. Courts considering *Monell* claims have assigned different levels of significance to the filing of prior lawsuits. Some have suggested that non-adjudicated claims are irrelevant. *See Morris v. City of New York*, No. 12 Civ. 3959 (JG), 2013 WL 5781672, at *11 (E.D.N.Y. Oct. 28, 2013) ("The fact that two of the defendants as well as a non-defendant supervising officer have had civil suits brought against them in the past that resulted in settlements is not even evidence of wrongdoing, let alone that the City has a custom or policy that fosters or results in wrongdoing."). But others have held that prior complaints are relevant insofar as they may put a municipality on notice of possible or actual constitutional violations. *See Edwards v. City of New York*, No. 14 Civ. 10058 (KBF), 2015 WL 5052637, at *6 n.3 (S.D.N.Y. Aug. 27, 2015) (noting that while "[i]t is certainly not always the case that the fact of a series of suits alleging similar claims supports a *Monell* claim . . . the point is one of notice") (citing, *inter alia*, *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) ("An obvious need [for more or better supervision] may be demonstrated through proof of repeated complaints of civil rights violations.")).

With these principles in mind, the Court turns to Calderon's TAC.

### 2.   Calderon's Various *Monell* Theories

Putting aside non-cognizable conclusory statements, *see Iqbal*, 556 U.S. at 678, the TAC principally supports its *Monell* claim by alleging that, in 16 civil lawsuits, plaintiffs have alleged

unlawful conduct by either South or Sosa.[11]  *See* TAC ¶¶ 92–93.  The TAC provides sparse information about these lawsuits.  Three of these lawsuits, as described, do not involve South or Sosa at all, but instead, officers named Melendez, Calloway, and Cummings, whose conduct is of uncertain relevance.  *See* TAC ¶ 92(f)–(h).  None of the lawsuits, as described, involved claims of false statements in a warrant application.  Instead, the TAC simply cites general claims of excessive force, *see id.* ¶¶ 92(a), (c); false arrest, *see id.* ¶¶ 92(b), (d), (e), (i), (j); and warrantless entry into a premises, *see id.* ¶¶ 93(a), (c), (d).  The TAC does not recite substantial evidence adduced in these civil cases, which appear to span 2002 to 2014, or any factual determinations made in them, save that most settled and two are pending.  *See id.* ¶¶ 92(i), 93(f).

These allegations fall far short of pleading either of the first two means of establishing *Monell* liability: that (1) a formal policy or (2) decisions made by final municipal decision-makers led Calderon's apartment to be unlawfully searched.  The TAC instead appears to base its *Monell* claim on a theory of *de facto* custom by the City, *see id.* ¶ 90, or of a failure by the City to train, supervise, or discipline.  *See id.* ¶¶ 88–89.  The Court considers these theories in turn.

### i.       Custom

As to the custom theory, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."  *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997).  But the lawsuits cited by Calderon,

---

[11] Calderon also points to seven cases "all involving the execution of warrants in locations where there was no criminal conduct going on, filed in the Eastern District of New York . . . in which defendant, CITY, paid monetary settlements."  TAC ¶ 94.

without more, do not plausibly suggest a "practice . . . so widespread as to have the force of law." *Id.*

Judge Karas's recent decision in *Tieman v. City of Newburgh*, No. 13 Civ. 4178 (KMK), 2015 WL 1379652 (S.D.N.Y. Mar. 26, 2015), is instructive. In *Tieman*, the Complaint alleged that the City of Newburgh "'has a policy or practice of using excessive force when effectuating arrests, and fails to train and/or discipline its employees to prevent violations of arrestee's [sic] constitutional rights.'" *Id.* at *14. It cited "an extensive history of lawsuits and other complaints," alleging that at least nine excessive-force suits were filed against the city in the preceding five years—including five that involved, as the plaintiff's case did, allegations of unnecessary dog bites. *Id* at *15. It further alleged that the City was on notice of the excessive-force problem because of comments from citizens at public forums and because of a consulting group's report on the police department's practices. *Id.* at *3. Judge Karas, however, held that these pleadings were insufficient to suggest a widespread custom or practice. *Id.* at *17. He noted that none of the lawsuits cited by the plaintiff had "result[ed] in an adjudication of liability." *Id.* (quoting *Walker v. City of New York*, No. 12 Civ. 5902 (PAC), 2014 WL 1259618, at *3 (S.D.N.Y. Mar. 18, 2014)). "Simply put," Judge Karas concluded, "the fact that there were allegations of thirteen instances of excessive force during arrests over four [or five] years (none of which involved findings or admissions of culpability) during which hundreds, if not thousands, of arrests were made does not plausibly demonstrate that the use of excessive force during arrest was so frequent and pervasive to constitute a custom." *Id.*

The same logic is decisive here. None of the lawsuits cited resulted in an adjudication or admission of liability and the number of suits does not suggest a pervasive illegal practice. Indeed, Calderon's claim of a municipal "custom" is even weaker than in *Tieman*. Calderon

does not cite *any* civil cases that implicated the unlawful practice she challenges (false statements in a warrant application). And the length of time spanned by the cited lawsuits (12 years), from a municipality (New York) far bigger than Newburgh, makes the number of cited cases particularly inadequate to demonstrate plausibly a municipal custom.

### ii.      Failure to train

Under this theory of *Monell* liability, "a city's failure to train its subordinates satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). To show deliberate indifference, "[p]laintiffs are required to submit evidence that defendants knew to a moral certainty that the City would confront a given situation; the situation presented the City with a difficult choice or there was a history of its mishandling the situation; and the wrong choice by the City would frequently cause the deprivation of plaintiffs' rights." *Id.* (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)).

In addition, "a plaintiff must plausibly allege a specific deficiency in the municipality's training." *Tieman*, 2015 WL 1379652, at *22. Before *Iqbal* and *Twombly*, the Second Circuit had stated that plaintiffs claiming a failure to train "need only plead that the city's failure to train caused the constitutional violation," because "[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004). Following *Iqbal* and *Twombly*, however, the Second Circuit has indicated that *some* non-conclusory allegation as to deficient training programs is necessary at the pleading stage. *See*

*Simms v. City of New York*, 480 F. App'x. 627, 631 n.4 (2d. Cir. 2012) (summary order) ("While it may be true that § 1983 plaintiffs cannot be expected to know the details of a municipality's training programs prior to discovery . . . this does not relieve them of their obligation under *Iqbal* to plead a facially plausible claim.");[12] *Simms v. City of New York*, No. 10 Civ. 3420 (NGG) (RML), 2011 WL 4543051, at *2 n.3 (E.D.N.Y. Sept. 28, 2011) ("Since [*Iqbal* and *Twombly*], courts in this district have generally required that plaintiffs provide more than a simple recitation of their theory of liability, even if that theory is based on a failure to train.") (collecting cases).

Notably, the TAC makes only conclusory and highly general allegations about the City's training programs. *See* TAC ¶ 89 ("[The City] has failed to properly and effectively train its employees with regard to proper constitutional and statutory limits on the exercise of their authority."). No specific deficiencies, however, are pled, including with regard to the practice at issue here—the preparation of warrant affidavits. The TAC, in generally claiming inadequate training, does not draw upon the records of any of the 16 lawsuits it cites. The Court therefore holds that the TAC's *Monell* theory, to the extent based on a claim of systematically deficient training practices, does not state a claim.

### iii.        Failure to supervise/discipline

"[M]unicipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*." *Batista*, 702 F.2d at 397. However, "the stringent causation and culpability requirements set out in [*City of Canton*] have been

---

[12] For instance, the Second Circuit suggested, a plaintiff lacking extensive knowledge of a city's training programs might "alleg[e] facts indicating '[a] pattern of similar constitutional violations by untrained [municipal] employees.'" *Simms*, 480 F. App'x. at 631 n.4 (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011)).

applied to a broad range of supervisory liability claims" beyond failure-to-train, including

failure-to-supervise and failure-to-discipline claims. *Reynolds*, 506 F.3d at 192. "Such a

complaint must allege that 'the need for more or better supervision . . . was obvious,' but that the

defendant 'made no meaningful attempt' to prevent the constitutional violation." *Missel v. Cty.

of Monroe*, 351 F. App'x 543, 546 (2d Cir. 2009) (summary order) (quoting *Amnesty Am.*, 361

F.3d at 127).

      Measured in light of these standards, the TAC falls short.  Even assuming *arguendo* that

the prior lawsuits sufficed to put the city on notice of a general need to supervise or discipline

South and/or Sosa, the TAC does not adequately plead that the city "made no meaningful

attempt" to do so. *Id.*  Indeed, tellingly, the TAC says nothing about City decision-makers'

responses to the cited lawsuits, including whether the City determined that unlawful conduct by

these officers had occurred.

      Judge Karas's analysis in *Tieman* is, again, instructive.  Judge Karas acknowledged that

the plaintiff, by citing prior lawsuits and other evidence of notice, had "sufficiently alleged that

the need for more or better supervision was obvious." *Tieman*, 2015 WL 1379652, at \*20.  But,

he held, the plaintiff had failed to allege any facts about the city's response other than to allege

generally that the officers "were not disciplined." *Id.* at \*21.  The TAC goes no further here.

*See* TAC ¶ 88 (alleging general failure "to discipline or otherwise properly supervise the

individuals engaged in such practices").  These allegations do not plausibly plead municipal

liability on a failure to supervise or discipline theory.

      For these reasons, Calderon's *Monell* claim is dismissed.

**D.     John/Jane Doe Defendants**

Calderon also brought claims against 10 John/Jane Doe defendants ("the Doe

defendants").  The Doe defendants must be dismissed because the TAC does not state a claim

against them.

Calderon alleges that the Doe defendants "are members of the NYPD who took place

[sic] in the incident described herein while working in the scope of their employment."  TAC

¶ 17.  The TAC also mentions unnamed police officers in discussing the search of apartment 5F.

*See id.* ¶¶ 53–64.  But the TAC does not allege the personal involvement of any of these officers

in the deprivation of her rights.  *See Patterson v. Cty. of Oneida*, 375 F.3d 206, 229 (2d Cir.

2004) ("[A] plaintiff must establish a given defendant's personal involvement in the claimed

violation in order to hold that defendant liable in his individual capacity under § 1983.").  The

Second Circuit has held, in the similar context of a malicious prosecution claim, that "one cannot

establish that an officer engaged in 'conduct undertaken in bad faith' simply by presenting

evidence of another officer's knowledge or state of mind."  *Savino*, 331 F.3d at 74 (citation

omitted); *see also Corley v. Vance*, No. 15 Civ. 1800 (KPF), 2015 WL 4164377, at *6 (S.D.N.Y.

June 22, 2015) ("[T]here are no allegations suggesting that the private defendants knew the

subpoenas or other court orders were invalid or had reason to question their validity.").

Similarly, here, South's and Sosa's alleged willingness to falsify information so as to

procure a search warrant cannot be imputed to the officers who conducted the ensuing search,

conducted as it was pursuant to a facially valid warrant.  Nor is this deficiency solved to the

extent the TAC suggests, *see* TAC ¶ 88, that one or more "John Doe" defendants were senior

policy-making officials, because the TAC fails to allege their personal involvement in *any*

decision affecting Calderon's rights.  *See Iqbal*, 556 U.S. at 676 ("Because vicarious liability is

31

inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

## CONCLUSION

For the foregoing reasons, the Court denies defendants' motion to dismiss Calderon's federal and state claims of false arrest, as brought against defendants South and Sosa.  The Court, however, grants defendants' motion to dismiss Calderon's *Monell* claim, and therefore dismisses the City of New York as a defendant from this lawsuit.  The Court also dismisses all claims against the John and Jane Doe defendants.

The Clerk of Court is directed to terminate the motion pending at docket number 45.  An order will issue shortly as to next steps in this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: October 5, 2015
      New York, New York